Suffolk, ss.

Boston, Massachusetts
October 5, 2010

**AFFIDAVIT OF SPECIAL AGENT JAMES G. CROMER**

I, Special Agent James G. Cromer, being duly sworn, depose and state as follows:

A. Introduction

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for six years. For the past five months, I have been assigned to a counter-intelligence squad in the FBI's Pittsburgh Field Office. Before that, I was assigned to a counterintelligence squad in the FBI's Boston Field Office. One of my responsibilities is to investigate possible national security violations, including acts of espionage and economic espionage by individuals within the United States. I have attended a variety of FBI-hosted training classes and conferences in recent years on techniques for investigating possible national security violations. I have also participated in counterintelligence training exercises in conjunction with other members of the United States intelligence community.

2. Since July 2006, I have been the case agent on an investigation into the unlawful disclosure of confidential business information by an individual named ELLIOT W. DOXER. I submit this affidavit in support of a criminal complaint charging DOXER, 42, of 75 Park Street, Apartment 7, Brookline, Massachusetts, with wire fraud, in violation of 18 U.S.C. § 1343.

As set forth in greater detail below, I believe there is probable cause to believe that from in or around June 2006 and continuing until at least March 31, 2009, DOXER has engaged in a scheme to defraud his employer, Akamai Technolgies, Inc. ("Akamai"), of confidential and proprietary Akamai business information by secretly providing that information to an individual whom DOXER believes to be an agent of a foreign government. Doxer carried out the scheme in part by sending an electronic wire communication (an email message) in interstate commerce on or about June 22, 2006; the email was addressed to the Boston consulate of a foreign country ("Country X") and offered to provide the information for that country's benefit. Doxer later asked for $3,000 as payment for information he had provided. He also wrote about his child's mother, who lived abroad: "His mother is a terrible human being and has caused me tremendous suffering. Not enough bad things can happen to her if you know what I mean."

3. This affidavit is based on my personal knowledge and training, my review of relevant reports, and on information related to me by other agents, police officers, and civilians, both orally and in writing. This affidavit does not include all of the facts of which I and the other law enforcement officials working on this investigation are aware, but instead includes only those facts that I believe are necessary to establish the requisite probable cause.

4. On or about June 22, 2006, DOXER, who works at Akamai's headquarters in Cambridge, Massachusetts, sent an email to the Consulate Of Country X in Boston, Massachusetts, containing the following message (with its original punctuation):

> I am a jewish american who lives in Boston. I know you are always looking for information and i am offering the little i may have.
>
> I work in a high tech company called Akamai technologies and i work in the finance department.
>
> we have more important clients including department of defense, airline manufacturers like Airbus and some Arab companies from Dubai. And today, Attorney General Alberto Gonzales is here on premises
>
> I would be happy to provide information to you but the limit of my information is invoicing and customer contact information. All this may not be of any value to you but i would offer any help i can to help [Country X].

The email's header information indicates that it was sent by "Elliot Doxer [elliot.doxer@gmail.com] on Thursday, June 22, 2006 [at] 9:26 a.m." Because June 22, 2006, was an ordinary workday, I believe there is probable cause to believe that DOXER sent the email from his home or office, both of which are located in Massachusetts. The consulate to which he sent the message is also located in Massachusetts. I have been informed by Google, Inc., which maintains Gmail.com (the email service DOXER used), that Google did not maintain any email servers in Massachusetts

in June 2006. It is therefore probable that the email crossed state lines twice: when it traveled from DOXER's computer to one of Google's out-of-state Gmail severs, and when it traveled from that server to Country X's consulate in Boston.

B. Akamai's Business

5. Based on my conversations with Akamai personnel and my review of company literature, I believe the following to be true and accurate. Akamai maintains the largest distributed computer network in the world, with over 42,000 computer servers located in over 900 networks across over 70 countries. Akamai's network handles 15-30% of the world's Internet traffic every day.

6. Akamai specializes in Internet content delivery, which, in essence, consists of using Akamai's computer network to distribute its customers' Internet information for a fee. Akamai's network can be used by the customer to distribute any portion of the customer's website, from individual objects on a given webpage, to a single webpage of the site, to the entire website. A business or organization that wants to present information over a website itself must usually invest in the necessary computer hardware, software, real estate, network bandwidth, and personnel to manage the website and information. Akamai's Internet content delivery customers, however, can reduce their costs by letting Akamai's content delivery network do the work for them. In addition, even if Akamai's customers manage their own websites, the customers can augment their capabilities

with Akamai's services. For example, Akamai's network can speed up its customers' websites and help handle increased demand for their information.

C. Undercover Operation to Establish Communications

7. On September 18, 2007, an FBI undercover agent ("UA") pretending to be an agent of Country X called Akamai's general telephone number and asked to talk to "Elliot Doxer." After the agent was transferred, a male came on the line and acknowledged that he was DOXER. The conversation (omitting pauses and non-grammatical interjections) between the UA and DOXER proceeded as follows:

UA: Elliot, my name is Benjamin.

DOXER: Yeah.

UA: I am calling because I believe that you and I, I understand that we share a mutual interest in the welfare of our people and our homeland.

DOXER: Okay.

UA: And, you may recall that you made an offer, an offer to help us about a year ago or so.

DOXER: Ah! Is this who I think it is?

UA: I think you know exactly who it is.

DOXER: Okay.

UA: The – it took us a little while, but, finally, we're getting in touch with you regarding that matter.

DOXER: Okay.

[Discussion of communications procedures]

DOXER: You know I mean, I don't have much to offer, but whatever, whatever I have, you know, I want to help. [Laughter.]

UA: Well look, look, you know it's like a jigsaw puzzle, sometimes the pieces of the puzzle, and they may to you seem insignificant –

DOXER: – okay –

UA: – but when I put the puzzle together, maybe they mean something.

DOXER: Okay.

[Discussion confirming that DOXER had not discussed his offer with anyone else, instructing him not to mention the phone call to anyone else, confirming that the agent represented Country X, and summarizing the communications procedures.]

8. During the telephone call, the UA told DOXER that he had already sent to DOXER's home address an envelope with some communications instructions. In fact, the FBI waited to mail those instructions until after DOXER had confirmed his interest in spying. On September 20, 2007, I assumed the UA's role of an agent of Country X, and in that assumed role, I wrote DOXER a letter containing instructions on how he should communicate with me. The envelope was addressed to DOXER at his home address of 1210 Chestnut St., Newton, Massachusetts.

9. At around the same time, I arranged for video surveillance of the spot at which communications were to be exchanged ("the dead drop"). Through my initial communication

with DOXER I had instructed him to pick up a communication on October 10, 2007. So on October 9, 2007, I left at the dead drop an envelope that contained a list of questions that covered DOXER's access to Akamai's technical information and client list (among other things), as well as a variety of other topics relating to DOXER's personal and family circumstances and his ability to travel to Country X and elsewhere internationally. I also left instructions for future communications. On October 11, 2007, I checked the dead drop and confirmed that the envelope I had left on October 9 had been retrieved.

10. My review of the October 10, 2007 video surveillance footage fixed on the dead drop shows that an individual retrieved the item that I left on October 9, 2007. That individual's physical appearance matches a Massachusetts RMV photograph of DOXER.

11. Over the course of the next 18 months, this sequence of events was repeated numerous times. I would leave a communication for DOXER at the dead drop and would return later to find that my communication had been retrieved and/or that a communication had been left for me. On each such occasion, my review of the videotape fixed on the dead drop indicated that the person who retrieved the communication and/or left a communication for me was DOXER. DOXER visited the dead drop on at least 62 occasions to place items, retrieve items, and/or

check for new items.

D. DOXER Discloses Akamai's Confidential Information

12. On October 25, 2007, I left at the dead drop an envelope containing questions about DOXER's vacation, travel, and personal plans; why he had contacted Country X; and the type of work and security at his company. When I returned to the dead drop on October 26 2007, the envelope containing the questions was gone and had been replaced by two new envelopes. The envelopes contained answers to the questions I had posed to DOXER in an earlier communication.

13. Among other things, DOXER indicated that although he could not obtain technical information about his company, he could provide a list of its clients. He indicated that he worked in Akamai's credit and collections or finance department, for which he contacted clients located in the United States and a number of foreign countries, including Country X. He stated that he had access to names, e-mails, addresses, invoices, and signed contracts for most, if not all, of the company's clients. He also broadly described Akamai's physical and computer security systems.

14. In his answers, DOXER also indicated that he could travel to Country X and support special and sensitive operations in his local area if needed. He stated that he had contacted Country X because he knew that Country X was always looking for

information and he wanted to help Country X against its enemies.

15. I left questions for DOXER at the dead drop again on November 9, 2007. On November 27, 2007, I checked the dead drop and found an envelope from DOXER. It contained a thirteen-page list identifying over 2,000 of Akamai's customers. It also contained handwritten pages that, among other things, asked whether the information was useful and referred to DOXER's risk of losing his job. The handwritten pages also stated that DOXER was not motivated by money, but would appreciate receiving something for his time, efforts, and risk. DOXER also asked if I could find out anything about his child, who lives abroad. I later learned through interviews with Akamai representatives that the thirteen-page list of businesses represented a significantly large number of Akamai's customers.

16. Among the other items DOXER provided during the 18-month period that I corresponded with him through the dead drop were the following:

a. In a letter I recovered from the dead drop on December 26, 2007, DOXER wrote, "You neglected to respond to my request for some kind of payment for my services. . . . I could be fired and am also breaking the law -- all I want is some compensation. What do you think is fair for the information I have provided? I think some of the things I have told you you would not be able to find out anywhere else[.]"

b. In a letter recovered from the dead drop on January 29, 2008, DOXER continued, "I haven't thought much about a fair price, but will let you know -- I am interested in helping [Country X] and money is not my primary motivation for helping you. A few thousand dollars is not unreasonable to me." DOXER then provided some information identifying his minor child, who he said was living with the child's mother and stepfather in another country. DOXER asked for pictures of the child and information about the child. DOXER also provided contractual papers between Akamai and the United States Department of Homeland Security (DHS), including a purchase agreement, a statement of work document, a technical proposal document, a price quote listing, and a list of DHS contact personnel. He also included a contract between Akamai and the FBI.

c. In a letter recovered from the dead drop on March 28, 2008, DOXER acknowledged that some documents he had provided were marked "confidential" and some were marked "proprietary." DOXER went on to ask for a few thousand dollars and stated, "I am not motivated by money but in my desire to help our homeland and our war against our enemies." DOXER wrote more about his son and the child's mother, saying that "[h]is mother is a terrible human being and has caused me tremendous suffering. Not enough bad things can happen to her if you know what I mean." DOXER then said that he would reduce his price in exchange for information

or pictures of the child.

d. In a letter recovered from the dead drop on April 14, 2008, DOXER talked of his having visited "the homeland," his new wife's interest in moving back to "the homeland," and his interest in traveling to Country X to visit a family member. He also asked for help if he and his wife decided to visit or move there. In the same letter, DOXER also wrote, "The mother of my son is a terrible person and I think you understand. This has caused me tremendous suffering and I wish her ill will."

e. In a separate letter recovered from the dead drop on April 14, 2008, DOXER noted that information associated with "DOD" (i.e. the United States Department of Defense) was enclosed with the letter. Also provided were contractual papers between Akamai and a United States DOD contractor (hereinafter "Company A"), including a product description of "Akamai-Pilot-Eval," the cost of the product, the terms of the service, various points of contacts at Company A, a photocopy of a Company A check made payable to "Akamai Technologies Inc," and a printout of e-mail correspondence between "Elliot Doxer [edoxer@akamai.com"] and a Company A employee.

f. In a letter recovered from the dead drop on May 14, 2008, DOXER wrote, "Here is the information I promised. I hope this information is helpful." Included with the letter were contractual papers between Akamai and an aerospace company

(hereinafter "Company B"). In these contractual papers the United States Air Force was noted as the end-user for the Akamai services. Among the items included in the papers were services purchased, billing start/stop dates, monthly service charges, a cost increase strategy, a statement of work document, and Company B points of contact.

g. In a letter recovered from the dead drop on June 27, 2008, DOXER wrote, "Here is the contact list you requested. I have provided names; emails; office phone; cell phone & department for all employees except in India." Included with the letter was a list that identified approximately 1,300 Akamai employees, their city/country locations, office phone numbers, mobile phone numbers, departments, and e-mail addresses.

h. In a letter that I placed at the dead drop on October 8, 2008, I included a copy of the original email that DOXER had sent to Country X's consulate in Boston offering to provide information. In a letter recovered from the dead drop on October 15, 2008, DOXER acknowledged having sent the email from one of his personal email accounts.

i. On March 13, 2009, I recovered from the dead drop a handwritten letter and five Akamai business contracts, three of which were indicated as current customers. Each contract included such sensitive details as the customer's name and address; the customer contact's name, telephone number, and

e-mail address; the term of the contract; the expiration date; the services provided; and prices.

j. On March 31, 2009, I recovered from the dead drop an envelope that contained ten Akamai business contracts, three of which were indicated as having expired, implying that the other seven contracts were with current customers. Each contract included such sensitive details as the customer's name and address; the customer contact's name, telephone number, and e-mail address; the term of the contract; the expiration date; the services provided; and prices.

E. <u>Akamai's Confidential Business Information</u>

17. In summary, the documents DOXER secretly provided me in order to benefit himself and Country X belonged to three general categories: an extensive list of Akamai's customers; business contracts and associated contractual documents between Akamai and over 20 Akamai customers; and an extensive, possibly complete, list of Akamai's employees. All of these documents contained valuable confidential business information belonging to Akamai.

18. Based on my conversations with Akamai employees and others, I believe the following to be true and accurate. As discussed above, Akamai specializes in Internet content delivery, which, in essence, consists of using Akamai's computer network to distribute its customers' Internet information through Akamai's network for a fee. According to Akamai's public website, www.akamai.com, Akamai employs more than 2,000 people

(approximately 600 in Massachusetts), carries 15% to 30% of all web traffic, and posted an annual gross revenue of $860 million in 2009. Despite Akamai's success in the content delivery network market, it competes against dozens of other providers, including at least one in Country X. To maintain its competitive edge, it keeps much of its information confidential.

19. The Customer List. DOXER provided a list identifying more than 2,000 Akamai customers. Those customers range in size from corporations that pay Akamai $1 million or more per month to those that pay approximately $2,000 - $3,000 per month. Although Akamai publicizes the identity of some of its customers (with their permission) for advertising purposes, some customers self-publicize their use of Akamai services, and some are so large that their use of Akamai's services is likely self-evident, Akamai keeps the identity of most its customers confidential. It does so mainly to prevent competitors from "stealing" those customers, i.e. from taking advantage of Akamai's sales and marketing efforts and expenditures by targeting businesses that have already been educated by Akamai about the usefulness of buying Internet content delivery services.

20. Before Akamai even tries to convince a potential customer to select Akamai for content delivery, it must first convince the customer of the general benefits of content delivery services -- whether provided by Akamai or anyone else. Many potential customers need to be convinced that a content delivery

service can do the same or better work than the potential customer was doing on its own, and for a better price. A crude analogy would be trying to convince a business to lease their automobiles rather than purchase and service the autos themselves. A key factor in a content delivery network provider's success -- and a significant cost of doing business -- is its ability to convince prospective customers of the need for content delivery network services. It takes considerable time, money, and effort to identify and sell prospective customers on the benefits of content delivery. This is difficult in part because content delivery services are a relatively new product: Akamai, one of the leading content delivery network providers, began selling these services commercially only in 1999. Moreover, the cost for these services can range up to several million dollars per year, and it may not be immediately obvious to a company -- especially a small or mid-size company with only a modest Internet presence -- that it can benefit substantially from those services.

21. Therefore, even before Akamai can try to convince a potential customer that Akamai's content delivery network services are better than its competitors', Akamai often must spend considerable resources to identify likely customers, determine how those potential customers can benefit from content delivery network services, and convince those potential customers that purchasing these services is worth their while.

22. Akamai sales representatives identify likely customers through a multi-step process. The first step is to identify a business or organization that maintains an Internet presence and evaluate its need for content delivery network services. The sales representative then studies the potential customer to understand its business, history, web strategy, and challenges. After that, the salesman attempts to quantify in dollar terms the benefits that could result from utilizing Akamai's services. The salesman then works with the prospective customer to identify which Akamai products suit the prospective customer's specific needs. This process can take many months or even a year to complete and sometimes yields no business relationship at all, in which case Akamai's investment of time and money in the prospective customer is lost. A competitor would have a significant advantage over Akamai if it could piggyback on Akamai's investments and avoid spending its resources on such marketing and sales efforts by pursuing only those organizations known to have already decided to use content delivery network services.

23. In 2009 Akamai employed approximately 700 sales, marketing, and support personnel and that sales, marketing, and support consumed approximately 21% of Akamai's 2009 gross annual revenue, or more than $166 million.

24. <u>The Contracts</u>. Like the customer list, the contracts between Akamai and various customers that DOXER provided me

contain valuable confidential business information belonging to Akamai. Among other things, each contract specifies the customer's name and contact information, the contract's beginning and end date, the nature of the services being provided, and the fees being charged for each service. That information is all sensitive because knowing it could greatly assist Akamai's competitors in wooing away existing Akamai customers. And by knowing the expiration date of Akamai's contract with a particular customer, a competitor would know the optimum time to make a pitch for that customer's business. By knowing the contract's services and fees, the competitor would know exactly what services and terms to offer in order to undercut Akamai. (The service fees associated with Akamai contracts are not publicized, nor is the information standardized.)

25. The Employee List. The employee list that DOXER provided is also valuable confidential business information. The list appears to contain all of Akamai employees' names, employment city/country locations, work departments, office telephone numbers, mobile telephone numbers, and e-mail addresses. Although subsets of this information are known to people outside Akamai who deal with Akamai employees, the company does not publicize an employee directory like the one that DOXER provided. A competitor could use the list to systematically recruit an entire Akamai department away from the company, or to identify the employees who might have information that the

competitor might find useful.

F. Akamai's Security Measures

26. Akamai protects its confidential business information -- including the information described above -- in a number of ways:

- It requires visitors to its offices to be escorted by Akamai personnel.

- Its employees must present security proximity badges to access Akamai's physical building and offices. Because Akamai generally provides its employees information on a need-to-know basis, the badges do not generally give each employee access to all of Akamai's offices. Rather, they give each employee access to the areas based on the employee's need to access the various departments. For example, employees who are given access to Akamai's general corporate facilities are not typically given access to sensitive engineering areas or other specialized areas.

- Akamai's employees are required to read and sign nondisclosure agreements in which they promise not to disclose the company's confidential business information. They are also provided security awareness training when they begin working for the company, and that training is refreshed annually for all employees. Additional security awareness training is provided for employees with certain sensitive duties. Akamai's information security personnel remind employees of their periodic security training and track employees' completion.

- Akamai's employee handbook and code of business conduct and ethics also require employees to protect and not disclose confidential proprietary information.

- All Akamai employees are also required to sign an agreement not to compete against Akamai or solicit Akamai's customers for a period after leaving Akamai's employ.

- Akamai labels certain documents as proprietary or confidential to indicate that employees should not release this information outside the company without appropriate need or permission. The contracts that DOXER provided were generally marked as confidential.

I, having signed this affidavit under oath, as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

JAMES G. CROMER
Special Agent
Federal Bureau of Investigation

Sworn to before me on
this 5th day of October, 2010.

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE